SELENDY GAY PLLC
Philippe Z. Selendy
Jennifer M. Selendy
Kelley A. Cornish
Maria Ginzburg
Julie Singer
Tony Russo
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000

*Attorneys for Plaintiffs Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GENESIS GLOBAL HOLDCO, LLC, *et al.*,[1]<br><br>Wind-Down Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>Jointly Administered |
| GENESIS GLOBAL CAPITAL, LLC, and GENESIS ASIA PACIFIC PTE. LTD,<br><br>Plaintiffs,<br><br>- against -<br><br>DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, DCG INTERNATIONAL INVESTMENTS LTD., HQ ENHANCED YIELD FUND LP (F/K/A HQ CASH MANAGEMENT FUND LP), GRAYSCALE OPERATING LLC (F/K/A GRAYSCALE INVESTMENTS LLC), FOUNDRY DIGITAL LLC (F/K/A DCG FOUNDRY LLC), GENESIS GLOBAL TRADING, INC., LUNO AUSTRALIA PTY LTD, DUCERA LLC, MICHAEL KRAMER, ALAN SILBERT, and INX LIMITED,<br><br>Defendants. | Adv. Pro. No. 25-_____(SHL) |

[1] The Wind-Down Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Wind-Down Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Wind-Down Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## ADVERSARY COMPLAINT

Plaintiffs Genesis Global Capital, LLC ("Genesis Capital") and Genesis Asia Pacific Pte. Ltd. ("Genesis AP", and together with Genesis Capital, "Plaintiffs" or "Genesis"), through their undersigned counsel, bring this complaint (the "Complaint") against Digital Currency Group, Inc. ("DCG"), Barry Silbert ("B. Silbert"), DCG International Investments Ltd. ("DCGI"), HQ Enhanced Yield Fund LP (f/k/a HQ Cash Management Fund LP) ("HQ"), Grayscale Operating LLC (f/k/a Grayscale Investments LLC) ("Grayscale"), Foundry Digital LLC (f/k/a DCG Foundry LLC) ("Foundry"), Genesis Global Trading, Inc. ("Genesis Trading"), Luno Australia Pty Ltd. ("Luno AU"), Ducera LLC ("Ducera"), Michael Kramer ("Kramer"), Alan Silbert ("A. Silbert"), and INX Limited ("INX," and together with DCG, B. Silbert, DCGI, HQ, Grayscale, Foundry, Genesis Trading, Luno AU, Kramer, Ducera, and A. Silbert, the "Insider Defendants," and each individually an "Insider Defendant") and allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief based on reasonable due diligence of Plaintiffs' books and records, Plaintiffs' ongoing investigation, and the documents and information presently available to Plaintiffs as to all other matters:

## NATURE OF THE ACTION

1. Plaintiffs bring this action to avoid and recover "in kind" preferential and fraudulent transfers of cryptocurrency and U.S. Dollars ("USD") now worth more than one billion dollars. These transfers were made to Genesis's parent company, DCG, its founder and CEO, Barry Silbert, and various DCG affiliates and other insiders in the year leading up to Plaintiffs' chapter 11 filings, all while Genesis was insolvent. These Insider Defendants typically initiated their transfers around watershed events in the cryptocurrency industry—including the collapse of Terra-Luna in May 2022, the collapse of Three Arrows Capital, Ltd. ("3AC") the following month, and the collapse

of FTX Trading Ltd. ("FTX") in November 2022—when the Insider Defendants knew through their close relationship with Genesis that its business was on the brink of collapse. As these events unfolded, DCG and Barry Silbert worked to fend off a run on the bank at Genesis, falsely assuring Genesis's customers that the business was "strong" and had a "ton of liquidity." While the Insider Defendants withdrew their assets and recovered 100% on USD and cryptocurrency loans from Genesis's crippled platform, the public was kept in the dark, and Genesis's customers did not likewise call their loans from Genesis before it suspended all withdrawals in November 2022 and crashed into bankruptcy in January 2023.

2. Barry Silbert created DCG and positioned it to profit from every facet of the cryptocurrency industry. His DCG conglomerate was comprised of affiliates whose businesses spanned the space, including crypto mining, cryptocurrency exchange, wealth management, and digital asset management companies. Barry Silbert created Genesis Capital in 2017 (with Genesis AP to follow in 2020) to operate as DCG's banking arm: Genesis borrowed cryptocurrency and/or USD from institutional counterparties or high-net-worth individuals in exchange for paying them fixed rates of interest on their balances. Then Genesis profited by loaning those assets to other counterparties for higher rates of fixed interest. By design, the DCG conglomerate, including Genesis, had integrated operations, shared personnel, and significant inter-organizational loans to and from Genesis.

3. By the end of 2021, Genesis had $14 billion of loans outstanding. It faced extraordinary systemic risk and had virtually no internal controls to mitigate that risk: Genesis extended loans to a concentrated and correlated group of counterparties all in the cryptocurrency industry, failed to effectively diligence those counterparties, accepted insufficient and volatile cryptocurrency collateral for loans, maintained almost non-existent loan reserves, and grossly

overstated the value of its assets and equity on its books. An outsized portion of loans to Genesis were open term and callable by lenders on demand, making Genesis particularly susceptible to a bank run should any one of these risks be exposed. In November 2021, outside consultant Oliver Wyman informed DCG and other insiders that Genesis faced serious risks that were unsustainable, but nothing was done to address those risks. As a result of all this, Genesis was insolvent by no later than December 31, 2021.

4. The cryptocurrency industry historically was volatile. Over the course of 2022, the structural risks at Genesis were exacerbated by a major downturn in this industry, leading to a series of collapses at counterparties and driving Genesis even deeper into insolvency. In early 2022, cryptocurrency prices steadily declined, then dropped more precipitously in late March. In April, Oliver Wyman warned DCG of a potential "market crash." In May, the first major cryptocurrency collapse occurred: the prices of both the TerraUSD "stablecoin" and LUNA "support" coin on the Terra-Luna ecosystem were wiped out, and the Terra-Luna developer halted activity on the blockchain. This collapse strained other crypto companies, causing a cascading effect as crypto holders pulled funds from other crypto exchanges. In June, cryptocurrency hedge fund 3AC's fate followed Terra-Luna's: 3AC defaulted on its loans from Genesis AP and commenced a liquidation proceeding. The 3AC loan was significantly undercollateralized, leaving a $1.1 billion "structural hole" in Genesis's balance sheet that was never filled.

5. DCG recognized the existential threat to Genesis and, with it, to DCG and the Insider Defendants that had loaned Genesis hundreds of millions of dollars. Thus, DCG initiated a campaign of misinformation to Genesis's customers, claiming that all was well at Genesis because DCG had issued to Genesis Capital a promissory note with a face-value amount of $1.1 billion. But that note had an undisclosed catch: it did not provide Genesis with any liquidity;

rather, it was payable only in 10 years and carried a de minimis 1% coupon. It was worth only a small fraction of the $1.1 billion Genesis reported on its balance sheet, leaving the "structural hole" unfilled. And in exchange for this sham note, Genesis signed away the value of its recoveries from the 3AC bankruptcy to DCG. In November, following publication of an article exposing structural defects in Alameda Research Ltd. ("Alameda") and FTX's capital and risk management, there was a sell-off of FTX's proprietary cryptocurrency and a bank run on FTX, leading FTX to file for bankruptcy along with its subsidiary Alameda.

6. At each critical moment, DCG and Genesis falsely assured its customers that Genesis was financially stable with adequate liquidity, while the Insider Defendants—who knew the truth—simultaneously called over a billion dollars' worth of loans to Genesis.

7. After Oliver Wyman warned of a market crash in April, Barry Silbert, along with DCG and its subsidiary DCGI, collectively pulled $129 million in loans out of Genesis Capital. In the wake of the Terra-Luna crash in May, DCG called $154 million in USD loans from Genesis Capital, while Genesis posted a carefully worded Tweet reassuring creditors that Genesis had "no direct exposure to UST and LUNA," a "strong balance sheet," and "ton[s] of liquidity." Within two weeks of the 3AC collapse in June, while Barry Sibert and DCG were bracing themselves for a bank run but directing Genesis to "continue to show the market that [Genesis is] lending," Insider Defendants called loans worth no less than $128 million. In April and June, DCG caused Genesis Capital to transfer to it tens of millions of dollars as supposed "tax payments," even though Genesis Capital had no tax obligations and received no consideration in return—these payments were really naked dividends. And in November, when FTX and Alameda collapsed and filed for bankruptcy, within two weeks, Insider Defendants called loans worth no less than $122 million.

8. Even then, at the direction of DCG and Barry Silbert, Genesis posted on Twitter that it had "no material exposure" to FTX. In truth, Genesis Capital had millions in loans extended to Alameda, and the FTX collapse left Genesis Capital with an additional $36.8 million hole in its balance sheet. The next day, a revised statement went out admitting that Genesis had approximately $175 million in funds "locked" with FTX. Genesis could no longer repay the loans that its customers were calling, so it suspended customer withdrawals and stopped all lending and borrowing activities on November 16, 2022—but not before DCG could pull its last, $50 million loan to Genesis on November 15. Plaintiffs filed for bankruptcy on January 19, 2023 (the "Petition Date"), alongside their parent company, Genesis Global Holdco, LLC ("Genesis Holdco," and together with Plaintiffs, the "Debtors").

9. Plaintiffs bring this adversary proceeding (the "Adversary Proceeding") pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure; Sections 502(d), 544(b), 547(b), 548(a), and 550(a) of Title 11 of the United States Code (the "Bankruptcy Code"); and Sections 274 and 276 of the N.Y. Debtor & Creditor Law § 270 et seq. (the "N.Y. DCL"), to seek disgorgement in-kind of cryptocurrency and USD which the Insider Defendants pulled from Genesis Capital or Genesis AP in the one-year period prior to the Petition Date—January 19, 2022 through January 19, 2023 (the "Preference Period"). These transfers, made while Genesis was insolvent and the public was kept in the dark by insiders, are today worth over $1.2 billion.

## JURISDICTION AND VENUE

10. The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C. J.).

11. This Adversary Proceeding brings claims under the Bankruptcy Code to recover preferences and fraudulent transfers. Accordingly, all claims are core pursuant to 28 U.S.C. § 157(b) and arise under Genesis Capital's chapter 11 case filed with the Court on January 19, 2023, *In re Genesis Global Capital, LLC*, No. 23-10064 (SHL), and Genesis AP's chapter 11 case filed with the Court on January 19, 2023, *In re Genesis Asia Pacific Pte. Ltd.*, No. 23-10065 (SHL), both of which are jointly administered under *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (the "Chapter 11 Case," and together with the chapter 11 cases of Genesis Capital and Genesis AP, the "Chapter 11 Cases").

12. Jurisdiction is also appropriate as this Court's *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Amended Joint Chapter 11 Plan and Granting Relief* (the "Confirmation Order"), ECF No. 1736, in the Chapter 11 Cases, approved the Genesis Debtors' chapter 11 plan (ECF No. 1712 (as amended on July 21, 2024 at ECF No. 1874, the "Plan")), which, at Article XI (11), provides that this Court "retain[s] jurisdiction" and may "adjudicate all matters, arising out of … the Chapter 11 Cases."

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1409 because this Adversary Proceeding arises under the Chapter 11 Case filed in this District, and venue in this Court is consistent with the interests of justice, judicial economy, and fairness.

14. The claims in this Complaint are timely filed pursuant to 11 U.S.C. § 546(a) and tolling agreements executed between Genesis and the Insider Defendants.

15. Pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure, this Court has jurisdiction over all the Insider Defendants, who have purposefully availed themselves of U.S. jurisdiction through, among other things, knowingly causing funds to be transferred to, or receiving funds from, Plaintiffs in the U.S. and/or U.S. banking institutions on behalf of Plaintiffs,

and otherwise interacting with individuals based in the U.S. in connection with the alleged misconduct at issue in this Complaint. All of the Insider Defendants further entered into agreements with a New York choice of forum and choice of law clause in connection with the alleged misconduct at issue in this Complaint. In addition, Insider Defendants DCG, B. Silbert, DCGI, Grayscale, Foundry, Genesis Trading, Kramer, and Ducera each filed a proof of claim in the Chapter 11 Cases.

16. Plaintiffs consent to entry of final orders and judgments by this Court in this Adversary Proceeding. Plaintiffs also consent to entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

17. Plaintiffs submit, without limitation, that the Court may enter a final order or judgment on its claims against Insider Defendants DCGI, Foundry, Grayscale, Genesis Trading, Kramer, and Ducera, because each filed a proof of claim in the Chapter 11 Cases.

## PARTIES

18. Plaintiff Genesis Global Capital, LLC is a cryptocurrency borrowing and lending company. It is an affiliate of Genesis Asia Pacific Pte Ltd. Genesis Capital, LLC is a debtor in the Chapter 11 Cases. During the relevant period, its principal place of business was New York, New York.

19. Plaintiff Genesis Asia Pacific Pte. Ltd. is an affiliate of Genesis Capital and a cryptocurrency borrowing and lending company. It primarily loaned assets transferred from Genesis Capital to cryptocurrency borrowers based in Asia. Genesis Asia Pacific Pte. Ltd. is a debtor in the Chapter 11 Cases. During the relevant period, it operated out of New York, New York and Singapore.

20. Insider Defendant Digital Currency Group, Inc. is a corporation organized under the laws of Delaware that invests in and operates companies within the cryptocurrency industry. DCG wholly owns Genesis Global Holdco, LLC, which wholly owns Plaintiffs, making DCG the ultimate parent of Plaintiffs. A chart of DCG, its affiliates, and related parties is annexed hereto as **Exhibit A**.

21. Insider Defendant Barry Silbert is the founder, CEO, chair of the board of directors, and controlling shareholder of DCG. B. Silbert is a resident of New York and the ultimate beneficial owner of Plaintiffs.

22. Insider Defendant DCG International Investments Ltd. is a corporation organized under the laws of Bermuda that engages in venture capital investing in the cryptocurrency market. DCGI is a direct, wholly owned subsidiary of DCG and is an affiliate of Plaintiffs.

23. Insider Defendant HQ Enhanced Yield Fund LP (f/k/a HQ Cash Management Fund LP) is a general limited partnership organized under Delaware law that manages investments. HQ is an indirect subsidiary of DCG and is an affiliate of Plaintiffs.

24. Insider Defendant Grayscale Operating LLC (f/k/a Grayscale Investments LLC) is a limited liability company organized under the laws of Delaware that engages in cryptocurrency and investment management. Grayscale is a direct, wholly owned subsidiary of DCG and is an affiliate of Plaintiffs.

25. Insider Defendant Foundry Digital LLC (f/k/a DCG Foundry LLC) is a limited liability company organized under the laws of Delaware that engages in cryptocurrency generation activities, such as Bitcoin "mining." Foundry is a direct, wholly owned subsidiary of DCG and is an affiliate of Plaintiffs.

26. Insider Defendant Genesis Global Trading, Inc. is a corporation incorporated in Delaware that engaged in cryptocurrency financial operations. Genesis Trading is a wholly owned subsidiary of DCG and an affiliate of Plaintiffs. Genesis Trading ceased operations in 2023 but has not yet wound-up and is a company capable of being sued pursuant to 8 Del. C. § 278.

27. Insider Defendant Luno Australia Pty Ltd. is a company organized under the laws of Australia that provides cryptocurrency wallet and exchange services. Luno AU is indirectly owned by DCG and is an affiliate of Plaintiffs. Pursuant to corporate restructuring of Luno AU and a "Deed of Assignment" dated October 4, 2022 (the "Luno Assignment Agreement"), Luno AU assumed the "right, title benefit, privileges and interest in" the Genesis loan portfolio of an affiliated entity, Luno Pte. Ltd. ("Luno SG"),[2] which prior to that date had extended loans to, and received transfers from, Genesis AP pursuant to a master loan agreement between Genesis AP and Luno SG dated July 29, 2020 (the "Luno SG MLA"). The existing loan portfolio was simultaneously "assigned, transferred and conveyed" from Genesis AP to Genesis Capital, to be governed by a "Master Digital Asset Loan Agreement," dated August 29, 2022, between Luno AU and Genesis Capital. Under the Luno Assignment Agreement, Luno AU assumed all "burdens, obligations [or] liabilities in connection with" Luno SG's loan portfolio, defined as "a number of individual loans with Genesis [AP], each evidenced by a loan term sheet governed by the terms and conditions of" the prior Luno SG MLA, "including any outstanding loans." Luno AU employees worked closely with Genesis Capital employees in New York to transfer its account and business to Genesis Capital in New York.

28. Insider Defendant Ducera LLC is a limited liability company organized under the laws of Delaware that provides financial advisory services with a focus on restructuring and

---

[2] Like Luno AU, Luno SG is indirectly owned by DCG and is an affiliate of Plaintiffs.

investment banking. Ducera has served as DCG's financial advisor prior to, during, and after the Preference Period.

29. Insider Defendant Michael Kramer is the co-founder and CEO of Ducera. He and Ducera served as financial advisors to DCG during the relevant period. Kramer is a resident of Connecticut. Kramer is also a shareholder in DCG and is a long-time professional colleague and personal friend of B. Silbert.

30. Insider Defendant Alan Silbert is B. Silbert's brother, and an officer and director, as well as the current North America CEO, of Defendant INX Limited. A. Silbert is a resident of Maryland. He is also a co-trustee of Silbert family trusts, which hold a substantial amount of DCG shares.

31. Insider Defendant INX Limited is a company organized under the laws of Gibraltar that offers cryptocurrency technology services. INX's North America CEO A. Silbert directed INX to extend and call loans to Genesis Capital, transferring USD to and from INX's bank account in Maryland to Genesis Capital in New York, New York.

## FACTUAL ALLEGATIONS

## I. THE DCG CONGLOMERATE

### A. DCG and Its Affiliates

32. In 2015, B. Silbert founded DCG, a venture capital firm focused on cryptocurrency. B. Silbert intended DCG to be a pioneer in the nascent cryptocurrency industry.

33. B. Silbert started his career as an investment banker at Houlihan Lokey, where he worked on some of the most high-profile bankruptcies of the early 2000s, including Enron and WorldCom. Through representing creditors on complex financial restructurings, B. Silbert became familiar with major accounting frauds, the risks of insolvency, creditors' rights upon insolvency, and the U.S. bankruptcy system. B. Silbert left investment banking in 2004 and

founded SecondMarket, a company which facilitated sales of restricted stock and bankruptcy claims.

34. Starting no later than 2015, through affiliates and portfolio companies, B. Silbert positioned DCG to profit from every facet of the cryptocurrency industry. DCG owns and operates businesses that span the industry, including crypto mining company Foundry, cryptocurrency exchange family Luno Group Holdings Limited ("Luno," the parent to Luno AU and Luno SG); wealth management firm for crypto entrepreneurs HQ Digital LLC (the parent to HQ); and Grayscale, a SEC-approved digital asset management firm that manages, among other things, the Grayscale Bitcoin Trust, an exchange-traded fund holding Bitcoin worth in excess of $15 billion.

35. B. Silbert created Genesis Capital and Genesis Holdco in 2017 (with Genesis AP following in 2020) to operate as DCG's banking arm, enabling DCG to provide "the full suite of services global investors require to manage their digital asset portfolios."

36. By B. Silbert's design, the DCG affiliates, including Genesis, had integrated operations. Insider Defendants DCG, DCGI, HQ, Grayscale, Foundry, Genesis Trading, and Luno AU—all Genesis affiliates within the DCG conglomerate—collectively loaned and borrowed over a billion dollars' worth of cryptocurrency and USD to and from Genesis in the Preference Period alone. The management teams of DCG, Genesis Capital, Genesis AP, and Grayscale worked side by side in a shared office space and with shared IT systems in New York City; the then-CEO of Genesis Capital, Michael Moro, even sat next to DCG COO Mark Murphy. Genesis and DCG shared an email server, and DCG had full access to Genesis's books and records.

37. Officers, directors, and employees for the DCG companies overlapped as well. From Genesis Trading's founding until June 22, 2022, for instance, B. Silbert was the Chair of the Genesis Trading Board of Directors, which functioned as a de facto board for Genesis. DCG's

CFO, Michael Kraines, served on the Genesis Trading Board from February 2021 until April 2023. B. Silbert and Kraines likewise served as directors of DCGI. Meanwhile, Mark Murphy, the president and COO of DCG, joined the Genesis Trading Board of Directors in June 2022. B. Silbert and Murphy both served as directors of Grayscale. Kraines and Murphy together served as directors of Luno, the parent entity to Luno AU. Luno itself shared officers and directors between Luno, Luno AU, and affiliate (and Genesis AP lender) Luno SG. DCG served as the manager of HQ Digital, LLC, the ultimate parent of HQ.

38. Meanwhile, Insider Defendants Ducera and its founder Kramer were financial advisors to DCG and became de facto advisors to Genesis. Kramer, in addition to being a substantial customer of Genesis Capital, was a shareholder in DCG and a long-time professional colleague and personal friend of B. Silbert, going back decades to when they worked together at Houlihan Lokey.

39. Insider Defendant A. Silbert is B. Silbert's brother. He also serves as trustee to Silbert family trusts that own a substantial portion of DCG. A. Silbert is a director, officer, and the North American CEO of Insider Defendant INX, another cryptocurrency company. Like companies within the DCG conglomerate, INX maintained a close relationship to Genesis—it was a lender to Genesis Capital, and one of its American-based subsidiaries currently employs Genesis Capital's former CEO from the Preference Period, Michael Moro, as its Chief Strategy Officer.

**B. Genesis's Business**

40. Genesis Capital's and Genesis AP's primary business was to borrow cryptocurrency and/or USD from institutional counterparties or high-net-worth individuals, in exchange paying them fixed rates of interest on their balances. Genesis then loaned those assets to other counterparties, in exchange charging fixed rates of interest. Like a bank, Genesis profited from the fixed spread between its borrowing and lending activities.

41. The basic mechanics of Genesis's business were as follows:

42. *First*, customers loaned assets—cryptocurrency or USD—to Genesis. Genesis accepted more than 20 different digital assets, including Bitcoin ("BTC"); Ether ("ETH"); and Ethereum Classic ("ETC"). Customers wired USD loans to Genesis's bank accounts in the U.S., and transferred crypto loans to "wallets" maintained by Genesis employees in New York through a U.S.-based crypto "wallet" provider.

43. Master Borrowing Agreements ("MBAs") governed customer loans. The MBAs allowed customers to structure the specifics of each loan with a term sheet. Loans could be set as open-term, meaning either party could terminate or "call" the loan at any time, or fixed-term with a set maturity date. Fixed-term loans in practice often became open-term loans at their maturity date, as Genesis did not insist on closing them and customers often let them continue. Genesis paid its customers—that is, its lenders—fixed interest on their loan balances until the loans were terminated.

44. *Second*, Genesis aggregated the proceeds from its customers' loans and, in turn, loaned the proceeds to third parties. Genesis charged those counterparties interest on the cryptocurrencies and USD it borrowed. Similar to a bank, which pays its customers less interest on deposits than it makes through its financial operations using deposited funds, Genesis earned profits by charging more interest to lend than it paid to borrow.

45. As with the DCG family broadly, the various Genesis businesses were intertwined. Genesis Capital and Genesis AP shared office space, operational infrastructure, officers, and executives in New York City, the principal place of Genesis Capital's business operations and the location of its CEO.

46. Genesis Capital was also the center of business operations, while Genesis AP extended the business to the Asian cryptocurrency markets. Genesis Capital provided Genesis AP with virtually all of its lending capital: when Genesis AP received cryptocurrencies or USD from a lender, it transferred them to Genesis Capital in New York to be managed under the consolidated loan book, and when Genesis AP loaned funds to a borrower, it obtained those funds from Genesis Capital. This created intercompany obligations between Genesis Capital and Genesis AP. And when either Genesis Capital or Genesis AP returned funds to lenders, the transfers ultimately originated with Genesis Capital—either through cryptocurrency wallets managed by Genesis Capital in New York or through USD wires from U.S. banks.

## II. GENESIS'S INEVITABLE DEMISE

### A. Genesis's Inherent Structural and Systemic Risks Were Ignored

47. Genesis's borrowing and lending business grew dramatically from 2019 to 2021, and by the end of 2021 it had $14 billion in loans outstanding. But while Genesis functioned like a bank—borrowing funds and then making loans of billions in USD and cryptocurrency in exchange for fixed interest payments and return of principal—it was not subject to the customary regulatory banking guardrails that ensure that banks function with adequate controls and sufficient capital to mitigate the risk of failure. Nor did Genesis implement prudent risk management practices of its own: it operated with flawed and deficient underwriting processes and did not even follow the limited risk policies it did institute. Genesis did not meaningfully diversify its loan books, either as to the number or the kinds of counterparties to which it was exposed nor as to the industries in which those counterparties operated; it did not conduct meaningful diligence into its counterparties' financials or business risks; it accepted illiquid and highly volatile alternative cryptocurrencies (or "alt-coins") as collateral for loans, even for its largest counterparties; it

maintained inadequate—almost non-existent—loan loss reserves; and as a consequence of all this, it grossly overstated the value of its assets and understated the value of its liabilities on its books.

48. As a result, Genesis faced existential and systemic risks and operated with virtually no internal controls to mitigate them. When the cryptocurrency market crisis hit in 2022, these systemic risks led to Genesis's inevitable collapse.

49. Genesis faced numerous, core structural, interrelated, and compound risks that ultimately led to its demise:

50. *First*, Genesis's loans were extraordinarily concentrated in a few counterparties. At the end of 2021, approximately 55% of Genesis Capital's loan book was to just one counterparty—Alameda, the financial arm of FTX. At the same time, 88% of Genesis AP's loan book was to crypto hedge fund 3AC. A further 6% of Genesis's collective loan book was to its parent entity DCG and other affiliates within the DCG corporate family. The default of any one of these counterparties would be catastrophic, and in fact two out of the three ultimately collapsed.

51. *Second*, Genesis failed to effectively diligence its counterparties and account for the true risk of default for the loans it extended. For instance, a prudent lender would have conducted operational diligence and undertaken a detailed analysis of each borrower's audited financials before issuing loans worth billions of dollars, but Genesis did not take either step. Alameda—Genesis Capital's largest borrower—did not even have audited financials while 3AC provided only its (purported) net asset value from July 2020 onward. Genesis barely conducted any business diligence on Alameda or any borrower; instead, Genesis rated the risk on its loans through a flawed internal credit rating system, based on unsubstantiated, outdated, and incomplete information. Genesis assigned its own parent company DCG and its affiliates an "A" rating, but there was no quantitative basis substantiating that rating. Similarly, Alameda's "B-" rating and

3AC's "B" rating were based on incomplete and inaccurate data. Because these ratings were based on scant information and were fundamentally flawed, they did not capture the actual default and recovery risks embedded in each of these counterparties, which posed an existential risk to Genesis. Instead, Genesis simply took on faith that its counterparties would pay back their loans. As a result, Genesis dramatically undervalued the risk of default on its multi-billion dollar loan book and lacked anything close to appropriate loan loss reserves and collateral.

52. *Third*, Genesis dramatically overestimated the value of the collateral it did receive. In its counterparty credit assessments, Genesis carried the collateral at spot value. For instance, the collateral that Alameda, Genesis's largest counterparty, provided was highly concentrated among a few digital assets—notably FTT and SRM, alt-coin cryptocurrencies issued by Alameda's sister company FTX and its affiliates.[3] The collateral was often very thinly traded and highly volatile. If Genesis were to quickly liquidate the collateral, the mass sell-off would have depressed market prices significantly. And if Genesis were to liquidate this volatile collateral gradually, it would be exposed to substantial price movements during the prolonged sale process. But Genesis improperly assumed its collateral was sufficient when valued at the spot price.

53. *Fourth*, Genesis failed to account for the systemic risks inherent in the highly volatile and correlated cryptocurrency industry. BTC and ETH, for instance, comprised (on paper) nearly $3 billion of Genesis's cryptocurrency investments in digital currencies and trusts. In the three years prior to the Petition Date, BTC and ETH experienced annualized volatility rates of 72% and 96%, respectively—meaning at that time, the prices of these assets could generally be expected to rise or fall between 72% and 96% over the course of a year (by comparison, volatility for gold

---

[3] Because FTT was FTX's proprietary token, its value rose and fell with the perceived value of FTX and Alameda. If FTX and Alameda defaulted on their loans, the market price of the FTT would collapse—which came true when both Alameda and FTX went bankrupt in November 2022.

in the same timeframe was just 16%). In addition to being volatile, cryptocurrency prices are also correlated, meaning if the value of one cryptocurrency drops, others are likely to drop too. BTC and ETH, for instance, have been measured to have a positive price correlation of approximately 89%—meaning that the values of these cryptocurrencies tend to rise or fall in the same direction.

54. Genesis also extended its loans to counterparties that were virtually all in the cryptocurrency industry themselves, meaning that, for example, a drop in the value of BTC could negatively impact Genesis's principal borrowers all at once. If cryptocurrencies started to fall in price rapidly, Genesis's counterparties would become less stable and more likely to default. Further, at the same time as its borrowers would be at increased risk of default, Genesis's cryptocurrency collateral would lose its value. Efforts to liquidate large amounts of cryptocurrency collateral would drive the currencies' prices down even more, further destabilizing the industry and increasing the risk of other defaults. Genesis failed to account for the high correlation among crypto assets. For example, Alameda posted as collateral FTT and SRM tokens issued by its affiliates. If cryptocurrency prices fell, Alameda's credit worthiness would fall, the collateral it posted would also fall, and then Genesis could not readily liquidate the collateral in a thin market. The credit underwriting process at Genesis overlooked such risks. Instead, Genesis operated with high levels of leverage, leaving it with virtually no ability to weather inevitable losses from the price volatility and correlation risk it faced.

55. The primary assets Genesis held were the loans it had extended. But Genesis Capital and Genesis AP failed to account for the true risk of default on its loans, and thus drastically overvalued those loans on their balance sheets.

56. By any fair valuation of its assets on account of these systemic and specific risks, Genesis had negative equity of hundreds of millions of dollars at the end of 2021. In other words,

the fair market value of Genesis's liabilities exceeded its assets, and Genesis was insolvent by December 31, 2021, at the latest. Genesis remained insolvent throughout the Preference Period.

57. To make matters worse, Genesis and the Insider Defendants were well aware of Genesis's perilous financial condition and did nothing to address it. DCG, DCGI, Genesis Trading, and B. Silbert had direct access to Genesis's books and records, which were a clear roadmap to Genesis's precarious financial condition. In the summer of 2021, DCG commissioned a third-party consulting firm, Oliver Wyman, specifically to assess Genesis's risk exposure. Oliver Wyman issued a report in November 2021 that identified myriad deficiencies with Genesis's risk management protocols including:

> 1. Genesis's "limited ability to analyze aggregate risk";
>
> 2. A "[l]ack of discussion on 'risk strategy'" within the organization;
>
> 3. "[N]o … management of capital for unexpected losses";
>
> 4. "Large concentrations exist[ing] within the portfolio which would result in 'break-the-business' scenarios in case of default"; and
>
> 5. That the "[p]arameters defined for the calculation of reserves [were] broadly untested."

58. DCG shared Oliver Wyman's report with DCG officers who had dual roles at DCGI, Luno, and Genesis Trading, among others. The report proposed a detailed plan to improve Genesis's risk management, but as long as Genesis's risky lending was fueling massive growth at DCG and its affiliates, DCG and B. Silbert were not incentivized to impose prudent guardrails. As late as January 2022, DCG conceded internally that there still were "ongoing concerns as to 'flying blind' in terms of monitoring risks" at Genesis.

59. The DCG conglomerate also set up risk committees that operated across affiliates, which understood Genesis's precarious financial condition but did nothing to address it. There was a "Genesis Risk Committee" that shared Genesis's financial information among DCG's

affiliates. The risk committee met intermittently throughout 2020 to discuss various types of risks among the entities within the DCG corporate family, including "Financial Risk," "Crypto Exposure," "Counterparty Risk," "Credit Risk," and "Genesis Global Capital/Lending Risk." These risk committee meetings were attended by Genesis representatives and officers of Insider Defendants DCG, DCGI, Foundry, Grayscale, and Genesis Trading.

60. Beginning in 2021 and continuing into 2022, officers and other executives of Genesis, DCG, DCGI, and Genesis Trading, comprising the "Enterprise Risk Management Committee," met periodically to discuss risks at Genesis. In connection with the Enterprise Risk Management Committee meetings, Genesis distributed an "enterprise risk report," detailing the urgency of addressing its various risks. For example, on March 25, 2021, the report identified 47 risks across Genesis's business: thirteen (13) were marked "critical," and twelve (12) were marked "high," including insufficient due diligence of lending counterparties and liquidity risk amidst a rapidly growing loan book.

## Risk Identification

Below is a summary count of the risks by level submitted by the various Departments.

| **Count of Risk Level** | **Risk Level** | | | | |
|---|---|---|---|---|---|
| **Business Unit** | **Critical** | **High** | **Moderate** | **Low** | **Total # of Risks** |
| Marketing | | 1 | 8 | | 9 |
| Operations | | 1 | 2 | 1 | 4 |
| Risk | 1 | 3 | 1 | | 5 |
| Sales | 1 | | 4 | | 5 |
| Legal | | 3 | 2 | | 5 |
| Trading | | | 1 | 2 | 3 |
| Compliance | 4 | 1 | | | 5 |
| Security | 3 | 2 | | | 5 |
| Finance | 3 | 1 | 1 | | 5 |
| Technology | 1 | | | | 1 |
| **Total # of Risks** | **13** | **12** | **19** | **3** | **47** |

## Risks Identified by Risk

| Risk | Risk Level | Risk Mitigation Plan | Risk Monitoring |
|---|---|---|---|
| Calculation of risk Genesis-wide | Critical | Development/implementation of risk system | Weekly meetings/actionable items |
| Continued due diligence of lending counterparties | High | Hired credit risk associate, hiring VP credit risk | Augmentation of existing processes |
| Trading volumes are increasing substantially month by month | High | Hired trading risk associate | Daily dashboard/aged inventory |
| Increased Derivatives Trading | High | Hired risk quant | Limits and daily pnl/risk attribution |
| Relationship between funding desk and other Genesis legal entities | Moderate | Created liquidity risk framework | Working with Reporting to detail limit usage |

(Annotation added)

61. From 2022 onwards, Genesis convened a risk committee composed of representatives from Genesis Capital and Genesis Trading, along with "observers" from DCG. This committee discussed Genesis's risk profile, including increased "external unsecured exposure," "Major Credit & Market Risks," and "liquidity risks."

62. DCG also convened regular "Subsidiary CEO" meetings. In attendance were CEOs from Genesis Capital, Grayscale, Foundry, and Genesis Trading; CEOs to the parent entities to Insider Defendants HQ and Luno AU; and the DCG COO, Mark Murphy. Across 2021 and 2022, in no fewer than ten (10) meetings, these DCG "Subsidiary CEOs" provided each other business updates and discussed Genesis's financial performance.

63. Despite the existence of all these groups and committees, they did nothing to actually address Genesis's structural risks. On February 9, 2022, at a meeting attended by representatives from DCG, Foundry, Grayscale, and Genesis Trading, Genesis reported that "***risk standards [at Genesis] do not exist or are outdated***" (emphasis added).

**B. Genesis's Unmitigated Risks Surface in 2022, Triggering Severe Losses**

64. While nothing was done to address the systemic risks at Genesis, Genesis's liabilities continued to exceed a fair valuation of its assets, and Genesis was positioned to collapse when the volatile cryptocurrency industry had a prolonged market downturn. That is exactly what happened in 2022.

65. The harbinger of the 2022 downturn was the early and steady decline in cryptocurrency prices. BTC, the most well-established cryptocurrency, fell from trading at a peak of $68,789.63 on November 10, 2021, to $42,478.30 by January 19, 2022—a 38% price drop in just over two months. This trend continued throughout the first quarter of 2022, then accelerated in late March when the value of BTC and other cryptocurrencies dropped even more precipitously.

66. The steep decline in cryptocurrency prices impacted Genesis immediately. The value of cryptocurrency Genesis held as collateral fell, impairing Genesis's ability to recover in the event of a counterparty default. These drastic price declines also destabilized the businesses of Genesis's crypto counterparties, who were heavily exposed to the risk of crypto price declines that made their default much more likely.

67. Insider Defendants recognized this market decline could have disastrous effects. On April 12, 2022, in advance of a meeting held the next day, DCG shared a new presentation from Oliver Wyman with DCGI, Grayscale, HQ, Foundry, and Luno that anticipated a cryptocurrency "market crash." The presentation laid out "[i]llustrative scenarios" related to Genesis's exposure, including defaults by Genesis's largest counterparties, a "[c]rypto market mini crash," and a drop in the value of BTC "leading to ripple effects across [the] broader crypto market."

68. May 2022 brought the first collapse of major cryptocurrencies: TerraUSD ("UST"), a so-called "stablecoin" whose value was algorithmically "pegged" to the U.S. dollar through

LUNA, a support coin and a part of the Terra-Luna ecosystem. In early 2022, LUNA traded at near all-time highs and, along with UST, had among the largest market volumes for cryptocurrencies. Their values declined during the industry downturn in the first half of 2022. The signs of a run on the bank at Terra-Luna appeared on May 7, 2022, when several large holders of UST exited their positions. Around this time, the algorithmic peg began to falter, creating a "de-peg" event (or "death spiral"), decimating the prices of both UST and LUNA (the "Terra-Luna Collapse"). Within three days, LUNA's price per coin dropped from $80 to almost zero, and UST—once steadily valued at 1:1 with the U.S. dollar—had sunk to just pennies. By May 13, 2022, the Terra-Luna developer had halted activity on the UST and LUNA blockchain.

69. Genesis Capital had approximately $350 million of exposure to Terra-Luna and ultimately lost approximately $50 million due to its collapse.

70. The Terra-Luna Collapse strained other crypto companies, causing a cascading effect as crypto holders pulled funds from other crypto exchanges.

71. Genesis's largest lenders began asking questions about the safety of their assets on the Genesis platform. These creditors were met with false assurances. For example:

- B. Silbert instructed Genesis employees to "put[] out a statement that [Genesis had] ***zero [TerraUSD] or Luna exposure***" and "immediately get the word out" that it was "in great shape" (emphasis added).

- He added that "shap[ing] the narrative" in this way was "about survival" of Genesis.

- Pursuant to B. Silbert's instruction, Genesis worked with DCG to "put out some statement to the public that Genesis has no direct exposure to" Terra-Luna.

- Finally, despite the tens of millions in losses, on May 11, 2022, Genesis posted a carefully worded Tweet reassuring creditors that Genesis had ***"no direct exposure to UST and LUNA***," which B. Silbert quickly touted to the public (emphasis added).




72. Insider Defendants knew the truth. For example, the same day that DCG and B. Silbert crafted the misleading May 11 tweet, the CEO of Insider Defendant Foundry, Michael Colyer, messaged the Genesis Capital COO inquiring about Genesis's actual exposure. Genesis revealed a $40 million loss, with more soon expected.



**Microsoft Teams chat between [Derar Islim, Michael Colyer]**

| | | |
|---|---|---|
| MC | **Michael Colyer**<br>were you guys able to get out of your UST position without too much damage? | 5/11/2022, 12:03 PM |
| DI | **Derar Islim**<br>yes, | 5/11/2022, 12:07 PM |
| DI | **Derar Islim**<br>just tried you; about 40mm loss; | 5/11/2022, 12:08 PM |
| DI | **Derar Islim**<br>but this is nothing considering the magnitude of the position we had; we can talk more later | 5/11/2022, 12:08 PM |
| DI | **Derar Islim**<br>I am focused on counterparty risk and indirect exposure now | 5/11/2022, 12:08 PM |
| MC | **Michael Colyer**<br>sorry I missed your call. | 5/11/2022, 12:22 PM |
| DI | **Derar Islim**<br>all good | 5/11/2022, 12:24 PM |
| MC | **Michael Colyer**<br>stay strong! | 5/11/2022, 1:05 PM |
| DI | **Derar Islim**<br>Let's keep the above between us please as well | 5/11/2022, 3:37 PM |
| MC | **Michael Colyer**<br>of course | 5/11/2022, 3:38 PM |

(Annotation added)

73. The Terra-Luna Collapse was just the start of Genesis's precipitous demise. Genesis AP's largest borrower-counterparty was 3AC, a cryptocurrency hedge fund based in Singapore. Genesis AP had approximately $2.36 billion of loans outstanding to 3AC. Genesis Capital, meanwhile, had a corresponding $2.36 billion intercompany loan to Genesis AP.

74. In June 2022, in no small part due to its own substantial exposure to the Terra-Luna Collapse, 3AC began failing to meet margin calls from lenders. On June 12, 2022, Genesis AP placed a margin call on its outstanding $2.36 billion obligation. 3AC did not meet the call and defaulted on its loans from Genesis AP (the "3AC Collapse"). 3AC commenced a liquidation proceeding on June 27, 2022 before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division).

75. Genesis AP's $2.36 billion loan to 3AC was significantly undercollateralized. Ultimately, Genesis AP was able to foreclose on just under half of its exposure, leaving a $1.1 billion "structural hole" in Genesis's balance sheet.

76. Insider Defendants immediately understood that the $1.1 billion hole could lead to a run on the bank:

- On June 13, 2022, shortly after being informed of the 3AC Collapse, Genesis personnel directly warned B. Silbert that Genesis could be facing a "***bank run***," and "need[s] to have enough cash to make up for [the 3AC] loss plus illiquid collateral" (emphasis added).

- B. Silbert nevertheless instructed Genesis to "***limit the extension of any new loans," but*** also told Genesis "to continue to ***show the market that we're lending***" to "shape the narrative" that "[G]enesis is safe and sound" (emphasis added).

- On June 14, 2022, B. Silbert and DCG's COO Murphy convened an "URGENT" call with the CEOs of DCG subsidiaries at HQ's parent, Grayscale, Foundry, Genesis Trading, and Luno. After the call, Genesis Capital's CEO convened a follow-up call with the group.

- Emails from the same week show DCG officers discussing the threat to Genesis as existential, stating they're trying to keep restructuring efforts quiet but "***the wrong move can sink us***" (emphasis added).

77. DCG planned for the worst, engaging bankruptcy counsel and its long-time financial advisors, Michael Kramer and Ducera, to assist with the crisis.

78. At the same time, Genesis's customers were told it was business as usual at Genesis:

- DCG prepared talking points for Genesis and its employees, instructing them to say that Genesis "continues to fund its activities as usual and has efficiently met the significant demands of [its] clients," that it has a "***[s]trong [b]alance [s]heet***," and that it is "[h]ighly capitalized" and "***maintain[s] robust levels of liquidity***" (emphasis added).

- On June 15, when one of Genesis Capital's largest lenders reached out for reassurance, a Genesis Capital employee, following the DCG talking points, reiterated the lie that Genesis had "a lot of asset recourse and liquid collateral on hand" and that it was "***not concerned about [its] overall position with [3AC] as a counterparty***" (emphasis added).

- Shortly after, DCG reviewed and approved a draft public statement by the Genesis Capital CEO that was distributed on Twitter, promptly "retweeted" by B. Silbert, and then shared with Genesis customers.




79. But Genesis's balance sheet was far from "strong." DCG knew it needed to fill the $1.1 billion "hole" left by the 3AC Collapse to prevent a run on the bank—while Genesis worked desperately to "keep[] the lights on."

80. Over the following weeks, officers and directors of DCG, DCGI, and their affiliates worked with Ducera and Kramer to structure an illusory boost to Genesis's balance sheet. On June 30, 2022, DCG issued a promissory note in the face amount of $1.1 billion to Genesis Capital, which had absorbed Genesis AP's 3AC loss, in exchange for Genesis assigning any recoveries on

its $1.1 billion claim in the 3AC bankruptcy to DCG (the "DCG Note"). But there was a catch—the DCG Note did not provide Genesis with ***any*** liquidity; rather, it was payable in 10 years and carried a 1% coupon payable at maturity. Thus, DCG set up the artifice that Genesis Capital's balance sheet would reflect the DCG Note as a $1.1 billion current asset. In reality, the DCG Note was worth a small fraction of what was reported on the Genesis balance sheet, did not resemble anything close to a current asset, and did nothing to stabilize Genesis's business with near-term liquidity. In addition, Genesis signed away its recoveries from the 3AC bankruptcy to DCG for DCG to then use any recoveries to pay down its $1.1 billion obligation.

81. This DCG subterfuge was concocted to falsely reassure Genesis's customers without creating any real exposure to DCG:

- On June 30, the day the DCG Note was executed to cover up the effects of the 3AC Collapse, B. Silbert told a concerned Genesis Capital lender that Genesis had a "strong balance sheet" and "ton[s] of liquidity."

**From:** Barry Silbert [barry@dcg.co]
**Sent:** 6/30/2022 2:59:18 PM
**To:** [redacted]@gmail.com]
**BCC:** Matt@genesiscap.co
**Subject:** Re: confirming i shouldn't be worried about lending bitcoin to genesis ATM

Hey man,

Matt @ Genesis says that you guys connected, so hopefully he was able to address the current state of things at Genesis (ton of liquidity, strong balance sheet, etc.) and answer any questions

**Barry Silbert**
Founder & CEO, Digital Currency Group

(Annotation added)

- On the same day, another significant customer was told that Genesis had "netted any losses [from 3AC] directly against [its] own … balance sheet."

- DCG and Genesis employees prepared a "3AC Post-Mortem" memo, which reiterated prior talking points and repeated the lie that Genesis's 3AC "[l]osses [were] predominantly absorbed by and netted against DCG balance sheet, leaving Genesis with adequate capitalization to continue [business as usual]."

- Genesis employees then shared the "3AC Post-Mortem" memo with various customers, alongside a purported "Statement of Financial Condition" for Genesis Capital that reflected the illiquid DCG Note—which would not convey any liquidity for another decade—as an asset worth its full $1.1 billion face-value.

**Genesis Global Capital LLC**
**Statement of Financial Condition (Unaudited)**
**June 30, 2022**
*(in thousands)*

| | |
|---|---|
| **Assets** | |
| Cash | $ 372,499 |
| Investments in digital currencies and trusts | 2,221,778 |
| Digital currency loans receivable, net of allowance for loan losses | 2,852,535 |
| USD loans receivable, net of allowance for loan losses | 1,959,084 |
| Digital currency collateral receivable | 2,386,030 |
| USD collateral receivable | 25,000 |
| Interest receivable, net of allowance | 122,441 |
| Receivable from related parties | 1,137,807 |
| Derivative assets | 999 |
| Other assets | 192,755 |
| **Total assets** | $ 11,270,929 |

(Annotation added)

- On July 6, Genesis Capital's CEO Michael Moro—in coordination with DCG officers—issued seven (7) tweets over Twitter, repeating the same, misleading reassurances that "DCG ha[d] assumed certain liabilities of Genesis related to [3AC]" and that DCG had worked with Genesis to "isolate the risk" of 3AC liabilities and "assumed certain liabilities" to "ensure [Genesis] ha[d] the capital to operate."

82. By falsely reassuring Genesis customers, DCG was able to stave off an immediate run on the bank at Genesis. But this was temporary; Genesis's actual financial condition did not improve, and the collapse of FTX and Alameda in November 2022 (the "FTX Collapse") finally shattered the fragile illusion.

83. Like Genesis, FTX and Alameda suffered from severe structural defects in their capital and risk management. On November 2, 2022, CoinDesk published an article exposing one of these failures by detailing the magnitude of Alameda's paper assets that were locked in the FTX proprietary token, FTT. This stoked fears that FTX and Alameda were undercapitalized, triggering a sell-off of FTT and a bank run on FTX, the combination of which ultimately led FTX and Alameda to file for bankruptcy protection on November 11, 2022.

84. At this time, Genesis Capital had approximately $151 million in loans to Alameda, and a significant amount of Genesis Capital's collateral against these loans consisted of FTT. Because FTX had collapsed, FTT was worthless, leaving Genesis Capital with an additional $36.8 million hole in its balance sheet.

85. Continuing desperate attempts to stave off Genesis's collapse, DCG and Genesis persisted in making false assurances about Genesis's financial health. On November 9, 2022, DCG and B. Silbert directed Genesis to post a statement from the "@GenesisTrading" Twitter account that Genesis had suffered only a $7 million loss "across all counterparties" and had "no material exposure to FTT," which was blatantly false. On November 10, 2022, after FTX's balance sheet was publicly disclosed, a revised statement went out admitting that Genesis had approximately $175 million in funds "locked" with FTX.

86. The music finally stopped; Genesis could no longer pay all the loans that its customers were calling. On November 16, 2022, Genesis Capital and Genesis AP suspended customer withdrawals and paused all lending and borrowing activities (the "Genesis Withdrawal Suspension"). On January 19, 2023, Genesis Holdco, Genesis Capital, and Genesis AP filed for bankruptcy.

## III. THE PREFERENTIAL AND FRAUDULENT TRANSFERS

### A. While Keeping Genesis's Customers in the Dark, Insider Defendants Called Over $1.2 Billion in USD and Crypto Loans

87. Throughout the year prior to Genesis's bankruptcy filing, DCG and Genesis falsely reassured customers that Genesis's balance sheet was "strong" and that it had a "ton of liquidity" to try to stave off the inevitable run on the bank. Meanwhile, the Insider Defendants called their loans ahead of other creditors in aggregate amounts of USD and cryptocurrency worth over

$1.2 billion as of March 31, 2025. Paragraphs 97–140 below, together with Exhibits B–K attached hereto, detail each wrongful transfer.

88. A clear pattern emerged throughout 2022: Insider Defendants called their loans in the face of cascading, destabilizing events, including the Terra-Luna Collapse, the 3AC Collapse, and the FTX Collapse, culminating in the Genesis Withdrawal Suspension.[4]

89. DCG owner and CEO, B. Silbert, was among the first to call his personal loans. Just one day after the April 13, 2022 "DCG Risk Mitigation" meeting featuring an Oliver Wyman presentation anticipating a cryptocurrency "market crash," B. Silbert pulled his outstanding $4 million dollar USD personal loan to Genesis Capital. The same day, DCG called a $75 million open term loan to Genesis Capital. One week later, DCG subsidiary DCGI called its $50 million loan to Genesis Capital.

90. In the wake of the May 2022 Terra-Luna Collapse, DCG called $154 million in USD loans with Genesis Capital on May 17 and 23, 2022. These transactions reduced DCG's outstanding loans to Genesis Capital to zero, following an all-time high of nearly $300 million two months prior.

91. Within two weeks of the 3AC Collapse in June 2022, Insider Defendants called loans worth no less than $128 million, including:

- On June 13, 2022, one day after the 3AC Collapse, Genesis Trading pulled its 750 BTC loan to Genesis Capital, then worth over $16 million USD.
- On June 13, 2022, while Genesis and DCG scrambled in the wake of the 3AC Collapse, DCG's financial advisors Ducera and Kramer sought to pull all their loans to Genesis Capital—including fixed term loans which had not yet matured. At the same time, they inquired whether Genesis would be suspending withdrawals entirely. Days later, on

[4] Other insiders, primarily officers and directors at Plaintiffs or at one of their affiliates within the DCG conglomerate received additional transfers similarly timed during these key windows of crisis at Genesis. Genesis has obtained tolling agreements with these parties and intends to pursue additional claims if out-of-court resolutions cannot be reached.

June 16, they formally pulled all loans to Genesis Capital that they could, totaling nearly $7 million.

- On June 17 and June 22, 2022, B. Silbert's brother and his company INX pulled all their BTC and USD loans to Genesis Capital, then worth approximately $1.7 million.

- On June 24, 2022, Genesis affiliate HQ pulled nearly $100 million USD in loans to Genesis Capital, despite having loaned these funds just weeks earlier.

92. Several months later, in October 2022, Genesis informed Ducera and Kramer that Gemini Trust Company ("Gemini"), would be terminating its Gemini Earn program with Genesis, which would result in the withdrawal of no less than $1.4 billion from Genesis Capital in the process. The following day, Kramer called his remaining loans that by then had matured, totaling over $2.6 million. DCG CFO Kraines noted Kramer's transfer and commented that it was "not a great vote of confidence" from a financial advisor with access to extensive and sensitive inside financial information.

GC **"Derar Islim" <"DIslim@Genesistrading.com"@Teams>** 10/13/2022, 4:40 PM
"FYI and for full disclosure. Ducera called the lending desk yesterday and asked to call back all OT loans right after Tom updated them on the Gemini situation - they only have small OT left -. They did the same, however, on June 16th right after we engaged them in the restructuring exercise. The only remaining loans to Kramer / Ducera are FT now expiring next month. I do not know what to make out of these activities, but I felt I need to share them with you. Furthermore, Ducera sent me an email yesterday asking Genesis to pay them $2mm for helping with the cash cloud deal!. I will deal with this after Gemini but I am not paying them that much. Thank you "

GC **"Derar Islim" <"DIslim@Genesistrading.com"@Teams>** 10/13/2022, 9:21 PM
"Gemini sent us the notice to call back the loans; the note is confusing as it is referring to 3 days and not 30, but legal is refuting and verifying "

DC **"Michael Kraines" <"michael@dcg.co"@Teams>** 10/13/2022, 9:25 PM
"Derar Islim FYI and for full disclosure. Ducera called the lending desk yesterday and asked to call back all OT loans right after Tom updated them on the Gemini situation - they only have small OT left -. They did the same, however, on June 16th right after we engaged them in the restructuring exercise. The on... not a great vote of confidence "

(Annotation added)

93. The next month, FTX collapsed, and Insider Defendants again called loans. The transfers during the two-week period following the FTX Collapse were worth no less than $122 million at that time:

- On November 8 to 11, 2022, Luno AU pulled loans to Genesis Capital in BTC, ETH, and USD, then worth nearly $2 million.

- On November 11, 2022, DCGI pulled BTC and ETH loans to Genesis Capital, then worth over $36 million.
- On November 11, 2022, Grayscale pulled loans to Genesis Capital totaling 105 BTC, then worth approximately $1.8 million.
- On November 13, 2022, Genesis Trading pulled 2,000 BTC in loans to Genesis Capital, then worth approximately $32.6 million.
- On November 15, 2022, facing the inevitable collapse of Genesis, DCG again pulled all of its funds (just as it had done in the wake of the Terra-Luna Collapse), obtaining a loan repayment of $50 million from Genesis Capital just prior to instituting the Genesis Withdrawal Suspension the very next day—preventing all non-insider customers from calling their loans to Genesis.

94. ***Insider Defendants recovered no less than $407 million in value in just six critical weeks***: the two weeks following each of the Terra-Luna Collapse, the 3AC Collapse, and the FTX Collapse, resulting in the Genesis Withdrawal Suspension.

95. Altogether, during the Preference Period, the Insider Defendants called USD loans totaling more than $620 million and cryptocurrency loans in excess of $216 million. The particulars of these transfers (the "Preferential Transfers" and each a "Preferential Transfer") are described below and set forth hereto in **Exhibits B–K**. As of March 31, 2025, that cryptocurrency is worth over $582 million, and the Preferential Transfers are worth over ***$1.2 billion***.

96. In addition, during the same window, DCG received fraudulent transfers of over $34 million from Genesis Capital supposedly to pay for tax liabilities that Genesis Capital did not have.

## B. Details of Each Individual Insider Defendant's Preferential and Fraudulent Transfers

### 1. DCG's Preferential Transfers

97. As detailed in **Exhibit B**, Insider Defendant DCG received Preferential Transfers from Genesis Capital during the Preference Period on January 24, 2022, April 7, 2022, April 8, 2022, April 14, 2022, May 17, 2022, May 23, 2022, and November 15, 2022.

98. Across eight transfers, DCG received a total of $448,005,534 USD. Each of the eight Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis Capital.

99. DCG is the ultimate owner of Genesis Capital and a person in control of Genesis Capital, making it an insider to Genesis Capital pursuant 11 U.S.C. § 101(31)(B)(iii) and N.Y. DCL § 270(h)(2)(iii). At all relevant times, Insider Defendant DCG beneficially owned Plaintiffs, as it wholly owned Genesis Holdco, which in turn wholly owned Genesis Capital and Genesis AP.

100. At the time of each of the Preferential Transfers, as demonstrated above, Insider Defendant DCG had reasonable cause to believe that Genesis Capital was insolvent, by virtue of its unfettered access to Genesis Capital's financial information, its access to internal and external risk reporting regarding Genesis Capital, and the otherwise extraordinarily close relationship between the parties.

**2. B. Silbert's Preferential Transfer**

101. As detailed in **Exhibit C**, on April 14, 2022, Insider Defendant B. Silbert received a Preferential Transfer from Genesis Capital in the amount of $4,000,000 USD, which was on account of unsecured, antecedent debt owed by Genesis Capital.

102. B. Silbert is an insider to Genesis Capital pursuant 11 U.S.C. § 101(31)(B)(iii). At all relevant times, B. Silbert was a controlling shareholder, director, and officer of DCG, which beneficially owned Plaintiffs.

**3. DCGI's Preferential Transfers**

103. As detailed in **Exhibit D**, Insider Defendant DCGI received Preferential Transfers from Genesis Capital on April 20, 2022, September 29, 2022, and November 11, 2022.

104. Across eleven transfers, DCGI received a total of 1,882.26 BTC and 78,539.01 ETH, altogether worth $136,752,711 at the time of the respective transfers (and worth

over $297 million as of March 31, 2025), and $50,000,000 USD. Each of the eleven Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis Capital. Each transfer originated at Genesis Capital in New York.

105. DCGI is an affiliate of Genesis Capital, making it an insider to Genesis Capital pursuant to 11 U.S.C. § 101(31)(E) and N.Y. DCL § 270(h)(4). At all relevant times, DCGI was wholly owned by DCG, which beneficially owned Plaintiffs.

106. At the time of each of the Preferential Transfers, as demonstrated above, Insider Defendant DCGI had reasonable cause to believe that Genesis Capital was insolvent, by virtue of its unfettered access to Genesis Capital's financial information, its access to internal and external risk reporting regarding Genesis Capital, and the otherwise extraordinarily close relationship between the parties.

**4. HQ's Preferential Transfers**

107. As detailed in **Exhibit E**, Insider Defendant HQ received Preferential Transfers from Genesis Capital on June 24, 2022 and July 14, 2022.

108. Across eight transfers, HQ received a total of $101,176,003 USD. Each of the eight Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis Capital.

109. HQ is an affiliate of Genesis Capital, making it an insider to Genesis Capital pursuant to 11 U.S.C. § 101(31)(E). At all relevant times, HQ was indirectly owned or otherwise controlled by DCG, which beneficially owned Plaintiffs.

**5. Grayscale's Preferential Transfers**

110. As detailed in **Exhibit F**, Insider Defendant Grayscale received Preferential Transfers from Genesis Capital on March 30, 2022 and November 11, 2022.

111. Across five transfers, Grayscale received a total of 105 BTC and 37,647.06 ETC, worth $3,655,101 at the time of the respective transfers (and worth over $9.2 million as of March

31, 2025). Each of the five Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis Capital.

112. Grayscale is an affiliate of Genesis Capital, making it an insider to Genesis Capital pursuant to 11 U.S.C. § 101(31)(E). At all relevant times, Grayscale was wholly owned by DCG, which beneficially owned Plaintiffs.

**6. Foundry's Preferential Transfer**

113. As detailed in **Exhibit G**, on April 2, 2022, Insider Defendant Foundry received a Preferential Transfer from Genesis Capital of 100 BTC, worth $4,581,605 at the time of the transfer (and worth over $8.2 million as of March 31, 2025), which was on account of unsecured, antecedent debt owed by Genesis Capital.

114. Foundry is an affiliate of Genesis Capital, making it an insider to Genesis Capital pursuant to 11 U.S.C. § 101(31)(E). At all relevant times, Foundry was wholly owned by DCG, which beneficially owned Plaintiffs.

**7. Genesis Trading's Preferential Transfers**

115. As detailed in **Exhibit H**, Genesis Trading received Preferential Transfers from Genesis Capital on February 17, 2022, February 28, 2022, June 13, 2022 and November 13, 2022.

116. Across seven transfers, Genesis Trading received a total of 2,750 BTC and 327,000 ETC, worth $59,370,452 at the time of the respective transfers (and worth over $231 million as of March 31, 2025). Each of the seven Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis Capital.

117. Genesis Trading is an affiliate of Genesis Capital, making it an insider to Genesis Capital pursuant to 11 U.S.C. § 101(31)(E). At all relevant times, Genesis Trading was wholly owned by DCG, which beneficially owned Plaintiffs.

### 8. Luno SG and Luno AU's Preferential Transfers

118. Between April 6, 2022 and November 11, 2022, Luno SG and Luno AU received 40 total preferential transfers from Genesis AP and Genesis Capital, collectively. As explained in Paragraph 27, pursuant to the Luno Assignment Agreement and Luno AU "Master Digital Asset Loan Agreement," on October 4, 2022, (i) Luno AU assumed the liabilities of Luno SG related to the loans it had extended to Genesis, (ii) Luno SG's loan portfolio was transferred to Luno AU, and (iii) Genesis Capital replaced Genesis AP as the counterparty for any outstanding and future loans as of October 4, 2022. All transfers from that date (October 4, 2022) forward were by Genesis Capital to Luno AU.

#### a. Luno SG's Preferential Transfers

119. As detailed in **Exhibit I**, on 25 dates between April 6, 2022 and October 3, 2022, Luno SG received Preferential Transfers from Genesis AP.

120. Across 32 transfers, Luno SG received a total of 245 BTC and 3,029.46 ETH, worth $9,647,071 at the time of the respective transfers (and worth over $25.6 million as of March 31, 2025), and $9,222,052 USD. Each of the 32 Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis AP. Each transfer originated at Genesis Capital in New York, with USD transfers transmitted from a Genesis AP bank account in the U.S.

121. Luno SG is an affiliate of Genesis Capital, making it an insider to Genesis Capital pursuant to 11 U.S.C. § 101(31)(E). At all relevant times, Luno SG was indirectly owned by DCG, which beneficially owned Plaintiffs.

#### b. Luno AU's Preferential Transfers

122. As detailed in **Exhibit I**, on seven dates between October 10, 2022 and November 11, 2022, Luno AU received Preferential Transfers from Genesis Capital.

123. Across eight transfers, Luno AU received a total of 94 BTC, 550 ETH, worth $2,325,636, at the time of the respective transfers (and worth over $8.7 million as of March 31, 2025), and $400,000 USD. Each of the eight Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis Capital. Each transfer originated at Genesis Capital in New York.

124. Luno AU is an affiliate of Genesis Capital, making it an insider to Genesis Capital pursuant to 11 U.S.C. § 101(31)(E). At all relevant times, Luno AU was owned by DCG, which beneficially owned Plaintiffs.

**9. Ducera and Kramer's Preferential Transfers**

125. As detailed in **Exhibit J**, Ducera received Preferential Transfers from Genesis Capital on June 16, 2022, and Kramer received Preferential Transfers from Genesis Capital on June 16, 2022 and October 13, 2022.

126. Across five transfers, Ducera received a total of $1,561,494 USD. Across thirteen transfers, Kramer received a total of $8,047,851 USD. Each of these eighteen Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis Capital.

127. At the time of the transfers, Ducera and Kramer were non-statutory insiders to Genesis Capital by virtue of their close relationship with Genesis Capital and access to inside information.

128. As set forth above, Ducera was a long-time financial advisor to DCG, having served in some capacity as a financial advisor to DCG since at least 2020. Ducera's CEO and founder, Kramer, had a long-term, close professional and personal relationship with Genesis's ultimate beneficial owner, B. Silbert. Kramer, who provided financial advisory services through Ducera to DCG and B. Silbert, is also a DCG shareholder.

129. In June 2022, Ducera assisted DCG in responding to Genesis Capital's liquidity crisis in the midst of the 3AC Collapse. On June 13, 2022, DCG CFO Michael Kraines received an email confirming that 3AC was facing "liquidity concerns" and estimated that Genesis's unsecured exposure at then-current prices was $500 million (in reality, it was over twice that). On information and belief, Ducera and Kramer were apprised of these updates. Ducera and Kramer were also given access to a dataroom detailing Genesis's exposure to 3AC.

130. On the very same day Genesis and DCG became aware of the 3AC Collapse, Ducera's COO, Patrick Dowling, inquired about the "options" for repayment of all of Ducera's and Kramer's then-outstanding loans, totaling approximately $19.4 million—including funds placed less than two weeks prior, as well as fixed term loans that had not yet matured. Recognizing the severity of Genesis Capital's financial predicament, Mr. Dowling also inquired whether Genesis would consider suspending withdrawals entirely.

PD **Patrick Dowling** 6/13/2022, 7:23 AM
Can you let me know 1) given current market conditions would genesis consider suspending withdrawals and 2) what our options are if we want to redeem our two 7-month loans before maturity

(Annotation added)

131. Over the following days, B. Silbert, DCG, and DCGI pushed Genesis to use Ducera as its advisor to assist in financial analysis, funding, liquidity, and even restructuring in the wake of the 3AC Collapse, and the Genesis Capital CEO began engaging Kramer and other Ducera staff regarding what DCG described as help in a "very volatile time where … the wrong move can sink us."

132. On June 16, 2022, while Genesis Capital's $1.1 billion loss in the wake of the 3AC Collapse was still a secret shared only among insiders, Ducera and Kramer recalled their loans to Genesis Capital.

133. On October 12, 2022, Genesis Capital's largest provider of loans and liquidity on the platform—Gemini—informed Genesis Capital that it intended to end the Gemini Earn program. Genesis promptly informed Ducera. At the same time, DCG prepared a draft presentation regarding the impact to Genesis if Gemini followed through on terminating the Earn program (leading to the withdrawal of no less than $1.4 billion in funds from Genesis), projecting "Genesis liquidity would drop to ($527mm)"—that is, over a half-billion dollars in the red—by the end of the month. On information and belief, DCG's financial update was also shared with its financial advisors, Ducera and Kramer.

134. Almost immediately, Patrick Dowling reached out to Genesis's lending desk to inquire about Kramer's loans. That same day, October 13, 2022, Kramer withdrew all of his open term loans to Genesis Capital, including funds that had been added to the platform less than two weeks earlier.

**10. A. Silbert and INX's Preferential Transfers**

135. As detailed in **Exhibit K**, A. Silbert received Preferential Transfers from Genesis Capital on June 17, 2022 and June 22, 2022, and INX received Preferential Transfers from Genesis Capital on June 17, 2022.

136. Across 37 transfers, A. Silbert received a total of 15.933 BTC, worth $318,004 at the time of the transfers (and worth over $1.3 million as of March 31, 2025), and $396,067 USD. Across four transfers, INX received a total of $1,008,585 USD. Each of these 41 Preferential Transfers was on account of unsecured, antecedent debt owed by Genesis Capital. Each transfer originated at Genesis Capital in New York.

137. A. Silbert is B. Silbert's brother. Because A. Silbert is a relative of a person in control of Genesis Capital, he is an insider to Genesis Capital pursuant to N.Y. DCL § 270(h)(2)(vi).

138. At the time of the transfers, INX was a non-statutory insider to Genesis Capital by virtue of its close relationship with Genesis Capital and access to inside information. Specifically, a statutory insider, A. Silbert, was INX's point of contact with Genesis Capital and agent with respect to the account. A. Silbert set up INX's account with Genesis and was an authorized user on INX's account, meaning he had the authority to execute transactions on INX's behalf with Genesis—including the Preferential Transfers in question. This close relationship is further evidenced by the fact that Genesis Capital's CEO Michael Moro joined an INX subsidiary following his departure from Genesis Capital in 2022.

**From:** Alan Silbert <alan.silbert@inx.co>
**Sent:** Friday, June 17, 2022 11:20 AM
**To:** Dan Gleim <dan@genesiscap.co>
**Cc:** Griffin Tiedy <GTiedy@genesistrading.com>; Michael Paleokrassas <mpaleokrassas@genesistrading.com>; Genesis Global Capital Lending <Lend@genesiscap.co>; Genesis Trading | Lending Ops <lendingops@Genesistrading.com>
**Subject:** Re: corporate lending

[EXTERNAL]
Can you please confirm there is no fee on the INX loans for pulling these loans early?
Thanks

**Alan Silbert**
*CEO - North America*
https://www.inx.co/
LinkedIn: Alan Silbert

(Annotation added)

139. At the time of the transfers, both A. Silbert and INX had reasonable cause to believe Genesis Capital was insolvent by virtue of inside information. A. Silbert is a co-trustee of trusts that own a significant number of DCG shares. A. Silbert has a close relationship with B. Silbert, his brother. It is no coincidence that A. Silbert called his and INX's loans in the face of the 3AC Collapse, when his brother was leading the effort to forestall a bank run at Genesis. Upon information and belief, B. Silbert informed his brother of the true financial condition at Genesis

Capital, which caused him to withdraw both his personal loans and those of INX, over which he controlled the disposition.

140. A. Silbert and INX's close relationship to Genesis and knowledge of its insolvency are additionally evidenced by A. Silbert's request, on behalf of INX, to pull loans that had not yet matured. Genesis allowed the transfers to be made in violation of the loans' terms under the MBA. A. Silbert and INX further knew to withdraw funds out of their Genesis Capital accounts that had been placed on June 1, 2022, just days prior to the 3AC Collapse.

**11. Insider Defendant DCG Received Additional USD Transfers on Account of Genesis Capital "Tax" Obligations That Never Existed**

141. On April 18 and June 15, 2022, respectively, DCG received transfers of $23,902,602 and $10,384,298 from Genesis Capital purportedly on account of obligations under a "tax sharing agreement." In fact, no such agreement existed, and Genesis Capital had no such obligations at the time. Thus, Genesis Capital did not receive *any* value, much less reasonably equivalent value, in exchange for these transfers, which constitute constructive fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

142. At all relevant times, Genesis Capital was a single-member LLC, indirectly wholly owned and treated as a "disregarded" tax entity by DCG pursuant to 26 C.F.R. § 301.7701-3(b)(1)(ii) for DCG's U.S. federal income tax consolidated group. Thus, DCG, the common parent of all Genesis group entities including Genesis Capital, owed taxes on behalf of the entire consolidated tax group. Genesis Capital did not "exist" as an entity for U.S. federal income tax purposes. Accordingly, as a disregarded entity, Genesis Capital did not have any legal obligation to pay income taxes to the IRS.

143. Genesis Capital likewise had no contractual obligation to make tax payments to DCG. Although there was a draft form "Agreement to Allocate Consolidated Income Tax

Liabilities and Benefits" (the "Draft Tax Sharing Agreement"), dated October 5, 2021, between DCG and Genesis Capital's parent, Genesis Holdco, that agreement was never executed or in force between DCG and Genesis Holdco—let alone DCG and Genesis Capital. Further, the Draft Tax Sharing Agreement, even if the parties had executed it, was illusory, one-sided, and oppressive. DCG prepared the Draft Tax Sharing Agreement requiring no consideration on its own part, while providing that it had "maximum discretion" and "the ability to deviate" from the Tax Sharing Agreement "in such manner as [DCG] deems appropriate or fit in [DCG's] sole discretion," including by modifying or amending the terms purportedly "without causing a breach."

144. The parties' conduct also reflects an understanding that no tax sharing agreement was ever in place. Counsel to DCG, in a February 2, 2024 email to Genesis's counsel, acknowledged that there was no tax sharing agreement in place. Similarly, in response to DCG's $347 million administrative claim for taxes in the Chapter 11 proceedings, DCG did not challenge Genesis's assertion that there was no tax sharing agreement.

145. Notwithstanding the lack of any legal or contractual obligation to make tax payments to DCG, Genesis Capital transferred $23,902,602 to DCG on April 18, 2022, and $10,384,298 in two payments to DCG on June 15, 2022, without receiving any consideration in return. Genesis Capital recorded these transfers as "tax payments" to DCG, but these payments (the "Tax Dividend Payments"), reflected in **Exhibit L**, were merely dividends made while Genesis Capital was insolvent and for which it received no value in return. Indeed, although Genesis Capital did not prepare a 2022 financial statement, in its 2021 statements it characterized similar "tax" payments as dividends.

## CAUSES OF ACTION

### COUNT ONE
### PREFERENCE CLAIM
### PURSUANT TO 11 U.S.C. § 547(b)
### (Plaintiff Genesis Capital Against Insider Defendants DCG, B. Silbert, DCGI, HQ, Grayscale, Foundry, Genesis Trading, Luno AU, Ducera, and Kramer)

146. Plaintiff Genesis Capital repeats, reiterates, and realleges each of the allegations in paragraphs 1 through 145 of this Complaint as if fully set forth below.

147. Plaintiff Genesis Capital made transfers, as reflected in Exhibits B–J, to DCG, B. Silbert, DCGI, HQ, Grayscale, Foundry, Genesis Trading, Luno AU, Ducera, and Kramer (the "Genesis Capital Preferential Transfers").

148. Each of the Genesis Capital Preferential Transfers was a transfer of property of Genesis Capital—namely cryptocurrency or USD.

149. Each of the Genesis Capital Preferential Transfers was made on account of an antecedent debt owed by Genesis Capital to each respective Insider Defendant.

150. Each of the Genesis Capital Preferential Transfers was made to or for the benefit of each respective Insider Defendant.

151. Each of the Genesis Capital Preferential Transfers occurred within one year before the filing of the petitions in the Chapter 11 Cases (*i.e.* January 19, 2023).

152. DCG, B. Silbert, DCGI, HQ, Grayscale, Foundry, Genesis Trading, Luno AU, Ducera, and Kramer were insiders to Genesis Capital, as defined in Section 101(31) of the Bankruptcy Code and applicable law, at the time each received the respective Genesis Capital Preferential Transfers. As detailed above, including in paragraphs 127–134, Ducera and Kramer were non-statutory insiders to Genesis Capital in view of their close relationship to Genesis and their exploitation of inside information of Genesis Capital at the time of the applicable transfers.

153. Each of the Genesis Capital Preferential Transfers was made while Genesis Capital was insolvent.

154. The Genesis Capital Preferential Transfers enabled the respective Insider Defendants to receive more than such Insider Defendant would receive if (a) the Genesis Capital Chapter 11 Case was a case under chapter 7 of the Bankruptcy Code, (b) the applicable Genesis Capital Preferential Transfer had not been made, and (c) such Insider Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

155. Genesis Capital brings these claims based upon reasonable due diligence into each of the Genesis Capital Preferential Transfers, including by reviewing the books and records of the company and other information about the Preferential Transfers, and by taking into account each Insider Defendant's known or reasonably knowable affirmative defenses, including under 11 U.S.C. § 547(c).

**COUNT TWO**
**PREFERENCE CLAIM**
**PURSUANT TO 11 U.S.C. § 547(b)**
**(Plaintiff Genesis AP Against Insider Defendant Luno AU)**

156. Plaintiff Genesis AP repeats, reiterates, and realleges each of the allegations in paragraphs 1 through 145 of this Complaint as if fully set forth below.

157. Plaintiff Genesis AP made certain transfers, as reflected in Exhibit I, to Luno SG (the "Genesis AP Preferential Transfers").

158. Each of the Genesis AP Preferential Transfers was a transfer of Genesis AP's property—namely, cryptocurrency or USD.

159. Each of the Genesis AP Preferential Transfers was on account of an antecedent debt owed by Genesis AP to Luno SG.

160. Pursuant to the Luno Assignment Agreement, Luno AU is liable for claims in connection with the transfers Genesis AP made to Luno SG, which includes liability for the Genesis AP Preferential Transfers.

161. Each of the Genesis AP Preferential Transfers was made to or for the benefit of Luno SG.

162. Each of the Genesis AP Preferential Transfers occurred within one year before the filing of the petitions in the Chapter 11 Cases (*i.e.* January 19, 2023).

163. Luno SG was an insider to Genesis AP, as defined in Section 101(31) of the Bankruptcy Code, at the time it received each Genesis AP Preferential Transfer.

164. Each of the Genesis AP Preferential Transfers was made while Genesis AP was insolvent.

165. The Genesis AP Preferential Transfers enabled Luno SG to receive more than Luno SG would receive if (a) the Genesis AP Chapter 11 Case was a case under chapter 7 of the Bankruptcy Code, (b) the applicable Genesis AP Preferential Transfer had not been made, and (c) Luno SG received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

166. Genesis AP brings these claims based upon reasonable due diligence into each of the Genesis AP Preferential Transfers, including by reviewing the books and records of the company and other information about the Preferential Transfers, and by taking into account Luno SG's known or reasonably knowable affirmative defenses, including under 11 U.S.C. § 547(c).

**COUNT THREE**
**VOIDABLE TRANSFER CLAIM**
**PURSUANT TO 11 U.S.C. § 544(b) AND N.Y. DCL § 274(b)**
**(Plaintiff Genesis Capital Against DCG, DCGI, A. Silbert, and INX)**

167. Plaintiff Genesis Capital repeats, reiterates, and realleges each of the allegations in paragraphs 1 through 145 of this Complaint as if fully set forth below.

168. Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

169. Plaintiff Genesis Capital made certain transfers, as reflected in Exhibits B, D, and K, to DCG, DCGI, A. Silbert, and INX, which transfers are avoidable under applicable law, including but not limited to the laws of New York (N.Y. Debt. & Cred. Law § 270 et seq.), pursuant to N.Y. D.C.L. § 274(b) (the "Genesis Capital N.Y. Voidable Transfers"). The Genesis Capital N.Y. Voidable Transfers are therefore avoidable by Plaintiff Genesis Capital.

170. Each of the Genesis Capital N.Y. Voidable Transfers was a transfer of property of Genesis Capital—namely, cryptocurrency or USD.

171. Each of the Genesis Capital N.Y. Voidable Transfers was to creditors whose claims arose before the transfer was made.

172. Each of the Genesis Capital N.Y. Voidable Transfers was made to or for the benefit of DCG, DCGI, A. Silbert, or INX on account of an antecedent debt of Genesis Capital.

173. Each of the Genesis Capital N.Y. Voidable Transfers occurred within one year before the filing of the petitions in the Chapter 11 Cases (*i.e.* January 19, 2023).

174. DCG, DCGI, A. Silbert, and INX were insiders to Genesis Capital, as defined under N.Y. DCL § 270(h) and applicable law, at the time each received each applicable Genesis Capital N.Y. Voidable Transfers. As detailed above, including in paragraphs 137–140, INX was a non-

statutory insider to Genesis Capital in view of it close relationship to Genesis and it exploitation of inside information of Genesis Capital at the time of the applicable transfers.

175. Each of the Genesis Capital N.Y. Voidable Transfers occurred while Genesis Capital was insolvent.

176. Each of the Genesis Capital N.Y. Voidable Transfers was made to, respectively, DCG, DCGI, A. Silbert, or INX while each had reasonable cause to believe that Genesis Capital was insolvent, as pleaded above, including in paragraphs 100, 106, and 139–140.

177. Each of the Genesis Capital N.Y. Voidable Transfers is avoidable by creditors who hold allowable unsecured claims against Genesis Capital in the Chapter 11 Case, including creditors who were creditors before the transfers, enabling Genesis Capital to bring these claims pursuant to 11 U.S.C. § 544(b).

**COUNT FOUR**
**FRAUDULENT TRANSFER CLAIM**
**PURSUANT TO 11 U.S.C. § 548(a)**
**(Plaintiff Genesis Capital Against Insider Defendant DCG)**

178. Plaintiff repeats, reiterates, and realleges the allegations in paragraphs 1 through 145 as if fully set forth below.

179. 11 U.S.C. § 548(a)(1)(B) permits a trustee to avoid any transfer of an interest of the debtor in property that was made or incurred on or within two years before the date of the filing of the petition, made while the debtor was insolvent, and for which the debtor received less than a reasonably equivalent value.

180. As detailed in paragraphs 141–145 above and as reflected in Exhibit L, the Tax Dividend Payments were made within two years of the filing of the Chapter 11 Cases, on April 18, 2022 and June 15, 2022, respectively, and Genesis Capital received nothing of value in return. Each of the Tax Dividend Payments was made while Genesis Capital was insolvent.

181. Plaintiffs seek to avoid the Tax Dividend Payments under 11 U.S.C. § 548(a)(1)(B).

**COUNT FIVE**
**RECOVERY OF PROPERTY**
**PURSUANT TO 11 U.S.C. § 550 and N.Y. D.C.L. § 276**
**(Plaintiffs Against All Insider Defendants)**

182. Plaintiffs repeat, reiterate, and reallege each of the allegations in paragraphs 1 through 145 of this Complaint as if fully set forth below.

183. Plaintiffs are entitled to avoid the Preferential Transfers pursuant to Sections 544(b) and 547(b) of the Bankruptcy Code, and Genesis Capital is entitled to avoid the Tax Dividend Payments pursuant to 548(a)(1)(B) of the Bankruptcy Code.

184. Each of the Insider Defendants was the initial transferee of the Preferential Transfers as identified in Exhibits B–K and DCG was the initial transferee of the Tax Dividend Payments as identified in Exhibit L.

185. Luno AU is further liable for the Preferential Transfers made to Luno SG by Genesis AP as an assignee under the Luno Assignment Agreement and, alternatively, as a subsequent transferee, to the extent that Luno SG's Preferential Transfers were transferred to Luno AU.

186. Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiffs are entitled to recover from each of the Insider Defendants the property transferred through the Preferential Transfers and the Tax Dividend Payments, including in-kind recovery for all cryptocurrency, or, in the alternative, the value of such transferred property in USD, plus interest thereon to the date of such recovery to the fullest extent allowed by applicable law.

## COUNT SIX
## DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)
## (Plaintiffs Against All Insider Defendants)

187. Plaintiffs repeat, reiterate, and reallege each of the allegations in paragraphs 1 through 145 of this Complaint as if fully set forth below.

188. Based upon the foregoing and pursuant to Section 502(d) of the Bankruptcy Code, any and all claims that have been or may in the future be asserted against Plaintiffs by Insider Defendants in the Chapter 11 Cases should be disallowed unless and until each respective Insider Defendant has turned over to Plaintiffs the property transferred, or alternatively, paid to Plaintiffs the value of such transferred property that each respective Insider Defendant is liable for pursuant to Section 550 of the Bankruptcy Code and Section 276 of the N.Y. DCL.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against each of the Insider Defendants and grant the following relief:

(a) Avoiding each of the Genesis Capital Preferential Transfers and each of the Genesis AP Preferential Transfers under 11 U.S.C. § 547(b);

(b) Avoiding each of the Genesis Capital N.Y. Voidable Transfers under 11 U.S.C. § 544(b) and applicable law, including but not limited to Section 274(b) of the N.Y. DCL;

(c) Avoiding each of the Tax Dividend Payments under 11 U.S.C. § 548(a);

(d) Directing the Insider Defendants to relinquish to Plaintiffs all property transferred, specifically returning cryptocurrency in-kind and all USD transferred through each of the Genesis Capital Preferential Transfers, each of the Genesis AP Preferential

Transfers, each of the Genesis Capital N.Y. Voidable Transfers, and each of the Tax Dividend Payments, under 11 U.S.C. § 550(a) and N.Y. D.C.L. § 276;

(e) Alternatively, awarding Plaintiffs no less than the present value of the property transferred through each of the Genesis Capital Preferential Transfers, each of the Genesis AP Preferential Transfers, each of the Genesis Capital N.Y. Voidable Transfers, and each of the Tax Dividend Payments;

(f) Pursuant to Section 502(d) of the Bankruptcy Code, disallowing any claims of the Insider Defendants that have been or may in the future be asserted against Plaintiffs by the Insider Defendants in the Chapter 11 Cases;

(g) Awarding Plaintiffs their attorneys' fees, pre- and post-judgment interest, and costs; and

(h) Awarding Plaintiffs all other relief, at law or in equity, to which they may be entitled.

[*Remainder of Page Intentionally Left Blank*]

Dated: New York, NY
May 19, 2025

Respectfully submitted,

SELENDY GAY PLLC

By: /s/ *Kelley A. Cornish*

Philippe Z. Selendy
Jennifer M. Selendy
Kelley A. Cornish
Maria Ginzburg
Julie Singer
Tony Russo
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
jselendy@selendygay.com
kcornish@selendygay.com
mginzburg@selendygay.com
jsinger@selendygay.com
trusso@selendygay.com

*Attorneys for Plaintiffs Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.*

**EXHIBIT A**

Chart of DCG, Affiliates, and Related Parties



**EXHIBIT B**

Preferential Transfers from Genesis Capital to **Digital Currency Group, Inc.** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date |
|---|---|---|---|---|
| 1 | 1/24/2022 | USD | 59,500,000.00 | $59,500,000.00 |
| 2 | 1/24/2022 | USD | 59,500,000.00 | $59,500,000.00 |
| 3 | 4/7/2022 | USD | 25,000,000.00 | $25,000,000.00 |
| 4 | 4/8/2022 | USD | 25,000,000.00 | $25,000,000.00 |
| 5 | 4/14/2022 | USD | 75,000,000.00 | $75,000,000.00 |
| 6 | 5/17/2022 | USD | 54,005,534.28 | $54,005,534.28 |
| 7 | 5/23/2022 | USD | 100,000,000.00 | $100,000,000.00 |
| 8 | 11/15/2022 | USD | 50,000,000.00 | $50,000,000.00 |

# EXHIBIT C

Preferential Transfers from Genesis Capital to **Barry Silbert** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date |
|---|---|---|---|---|
| 1 | 4/14/2022 | USD | 4,000,000.00 | $4,000,000.00 |

**EXHIBIT D**

Preferential Transfers from Genesis Capital to **DCG International Investments Ltd.** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date[1] |
|---|---|---|---|---|
| 1 | 4/20/2022 | USD | 15,000,000.00 | $15,000,000.00 |
| 2 | 4/20/2022 | USD | 5,614,045.26 | $5,614,045.26 |
| 3 | 4/20/2022 | USD | 24,199,050.73 | $24,199,050.73 |
| 4 | 4/20/2022 | USD | 4,186,904.01 | $4,186,904.01 |
| 5 | 4/20/2022 | USD | 1,000,000.00 | $1,000,000.00 |
| 6 | 9/29/2022 | ETH | 75,300.00 | $100,581,975.00 |
| 7 | 11/11/2022 | ETH | 1,500.00 | $1,927,650.37 |
| 8 | 11/11/2022 | ETH | 1,739.01 | $2,234,805.10 |
| 9 | 11/11/2022 | BTC | 92.00 | $1,564,480.54 |
| 10 | 11/11/2022 | BTC | 776.00 | $13,196,050.72 |
| 11 | 11/11/2022 | BTC | 1,014.26 | $17,247,749.86 |

[1] For reference, Plaintiffs have provided the market value of the various assets as of the date of the Preferential Transfers. In doing so, Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the recovery valuation date for the Preferential Transfers or the form of recovery on any judgments.

**EXHIBIT E**

Preferential Transfers from Genesis Capital to **HQ Enhanced Yield Fund LP** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date |
|---|---|---|---|---|
| 1 | 6/24/2022 | USD | 99,500,000.00 | $99,500,000.00 |
| 2 | 7/14/2022 | USD | 1,000,000.00 | $1,000,000.00 |
| 3 | 7/14/2022 | USD | 478,676.17 | $478,676.17 |
| 4 | 7/14/2022 | USD | 171,187.41 | $171,187.41 |
| 5 | 7/14/2022 | USD | 7,515.47 | $7,515.47 |
| 6 | 7/14/2022 | USD | 7,327.08 | $7,327.08 |
| 7 | 7/14/2022 | USD | 6,742.90 | $6,742.90 |
| 8 | 7/14/2022 | USD | 4,554.79 | $4,554.79 |

**EXHIBIT F**

Preferential Transfers from Genesis Capital to **Grayscale Operating LLC** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date[2] |
|---|---|---|---|---|
| 1 | 3/30/2022 | ETC | 6,862.32 | $340,782.60 |
| 2 | 3/30/2022 | ETC | 8,929.43 | $443,435.33 |
| 3 | 3/30/2022 | ETC | 21,855.32 | $1,085,335.02 |
| 4 | 11/11/2022 | BTC | 34.75 | $590,913.89 |
| 5 | 11/11/2022 | BTC | 70.25 | $1,194,634.21 |

[2] For reference, Plaintiffs have provided the market value of the various assets as of the date of the Preferential Transfers. In doing so, Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the recovery valuation date for the Preferential Transfers or the form of recovery on any judgments.

# EXHIBIT G

Preferential Transfer from Genesis Capital to **Foundry Digital LLC** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date[3] |
|---|---|---|---|---|
| 1 | 4/2/2022 | BTC | 100.00 | $4,581,605.00 |

[3] For reference, Plaintiffs have provided the market value of the various assets as of the date of the Preferential Transfers. In doing so, Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the recovery valuation date for the Preferential Transfers or the form of recovery on any judgments.

**EXHIBIT H**

Preferential Transfers from Genesis Capital to **Genesis Global Trading, Inc.** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date[4] |
|---|---|---|---|---|
| 1 | 2/17/2022 | ETC | 2,000.00 | $58,860.00 |
| 2 | 2/17/2022 | ETC | 15,000.00 | $441,450.00 |
| 3 | 2/17/2022 | ETC | 60,000.00 | $1,765,800.00 |
| 4 | 2/28/2022 | ETC | 250,000.00 | $7,655,000.00 |
| 5 | 6/13/2022 | BTC | 750.00 | $16,840,702.50 |
| 6 | 11/13/2022 | BTC | 1,000.00 | $16,304,320.00 |
| 7 | 11/13/2022 | BTC | 1,000.00 | $16,304,320.00 |

[4] For reference, Plaintiffs have provided the market value of the various assets as of the date of the Preferential Transfers. In doing so, Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the recovery valuation date for the Preferential Transfers or the form of recovery on any judgments.

**EXHIBIT I – LUNO TRANSFERS**

Preferential Transfers from Genesis AP to **Luno SG** (#1-32) and Genesis Capital to **Luno AU** (#33-40) during the Preference Period[5]

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date[6] |
|---|---|---|---|---|
| 1 | 4/6/2022 | USD | 671,400.00 | $671,400.00 |
| 2 | 4/6/2022 | USD | 331,650.00 | $331,650.00 |
| 3 | 4/8/2022 | ETH | 30.00 | $95,812.20 |
| 4 | 4/14/2022 | ETH | 50.00 | $151,091.50 |
| 5 | 5/4/2022 | ETH | 45.00 | $132,281.10 |
| 6 | 5/6/2022 | USD | 2,500,000.00 | $2,500,000.00 |
| 7 | 5/10/2022 | ETH | 34.90 | $81,706.54 |
| 8 | 5/12/2022 | BTC | 15.00 | $433,941.00 |
| 9 | 5/12/2022 | ETH | 330.00 | $644,371.20 |
| 10 | 5/16/2022 | BTC | 20.00 | $596,749.00 |
| 11 | 5/23/2022 | ETH | 70.00 | $137,942.00 |
| 12 | 5/27/2022 | ETH | 80.00 | $137,841.60 |
| 13 | 6/10/2022 | USD | 3,500,000.00 | $3,500,000.00 |
| 14 | 6/13/2022 | ETH | 140.00 | $168,872.20 |
| 15 | 6/14/2022 | USD | 1,900,000.00 | $1,900,000.00 |
| 16 | 6/15/2022 | BTC | 75.00 | $1,691,805.00 |
| 17 | 6/17/2022 | USD | 14,004.86 | $14,004.86 |
| 18 | 6/17/2022 | USD | 11,555.15 | $11,555.15 |
| 19 | 6/17/2022 | USD | 7,780.33 | $7,780.33 |
| 20 | 6/21/2022 | USD | 156,600.00 | $156,600.00 |
| 21 | 6/29/2022 | BTC | 135.00 | $2,712,102.75 |
| 22 | 6/29/2022 | ETH | 1,700.00 | $1,867,416.00 |
| 23 | 6/29/2022 | USD | 38,273.71 | $38,273.71 |

[5] For the reasons set forth at paragraph 27, Luno AU assumed the liabilities of Luno SG in connection with transfers for Luno SG's loan portfolio with Genesis AP, including transfers reflected in lines one (1) through 32 of Exhibit I.

[6] For reference, Plaintiffs have provided the market value of the various assets as of the date of the Preferential Transfers. In doing so, Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the recovery valuation date for the Preferential Transfers or the form of recovery on any judgments.

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date[6] |
|---|---|---|---|---|
| 24 | 6/29/2022 | USD | 23,858.98 | $23,858.98 |
| 25 | 7/15/2022 | ETH | 70.00 | $86,210.60 |
| 26 | 7/20/2022 | ETH | 150.00 | $228,228.00 |
| 27 | 8/18/2022 | USD | 16,929.26 | $16,929.26 |
| 28 | 8/25/2022 | ETH | 50.00 | $84,783.50 |
| 29 | 8/30/2022 | USD | 50,000.00 | $50,000.00 |
| 30 | 9/8/2022 | ETH | 80.00 | $130,864.00 |
| 31 | 9/30/2022 | ETH | 175.00 | $232,555.75 |
| 32 | 10/3/2022 | ETH | 24.56 | $32,497.54 |
| *October 4, 2022 - Luno SG's loan portfolio with Genesis AP transfers to Genesis Capital and is placed under Luno AU's name.* | | | | |
| 33 | 10/10/2022 | BTC | 3.00 | $57,399.60 |
| 34 | 10/14/2022 | BTC | 15.00 | $287,732.10 |
| 35 | 10/27/2022 | BTC | 20.00 | $405,901.80 |
| 36 | 11/8/2022 | BTC | 8.00 | $148,393.36 |
| 37 | 11/9/2022 | ETH | 550.00 | $604,538.00 |
| 38 | 11/10/2022 | BTC | 10.00 | $175,473.00 |
| 39 | 11/11/2022 | BTC | 38.00 | $646,198.36 |
| 40 | 11/11/2022 | USD | 400,000.00 | $400,000.00 |

**EXHIBIT J**

Preferential Transfers from Genesis Capital to **Ducera LLC** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date |
|---|---|---|---|---|
| 1 | 6/16/2022 | USD | 821.92 | $821.92 |
| 2 | 6/16/2022 | USD | 5,098.68 | $5,098.68 |
| 3 | 6/16/2022 | USD | 20,197.54 | $20,197.54 |
| 4 | 6/16/2022 | USD | 35,376.12 | $35,376.12 |
| 5 | 6/16/2022 | USD | 1,500,000.00 | $1,500,000.00 |

Preferential Transfers from Genesis Capital to **Michael Kramer** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date |
|---|---|---|---|---|
| 1 | 6/16/2022 | USD | 39,543.17 | $39,543.17 |
| 2 | 6/16/2022 | USD | 43,530.39 | $43,530.39 |
| 3 | 6/16/2022 | USD | 44,006.64 | $44,006.64 |
| 4 | 6/16/2022 | USD | 48,995.59 | $48,995.59 |
| 5 | 6/16/2022 | USD | 76,401.19 | $76,401.19 |
| 6 | 6/16/2022 | USD | 93,113.74 | $93,113.74 |
| 7 | 6/16/2022 | USD | 2,500,000.00 | $2,500,000.00 |
| 8 | 6/16/2022 | USD | 2,500,000.00 | $2,500,000.00 |
| 9 | 10/13/2022 | USD | 46,668.09 | $46,668.09 |
| 10 | 10/13/2022 | USD | 47,621.58 | $47,621.58 |
| 11 | 10/13/2022 | USD | 47,921.69 | $47,921.69 |
| 12 | 10/13/2022 | USD | 60,048.93 | $60,048.93 |
| 13 | 10/13/2022 | USD | 2,500,000.00 | $2,500,000.00 |

**EXHIBIT K**

Preferential Transfers from Genesis Capital to **Alan Silbert** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date[7] |
|---|---|---|---|---|
| 1 | 6/17/2022 | USD | 1,913.10 | $1,913.10 |
| 2 | 6/17/2022 | USD | 2,095.89 | $2,095.89 |
| 3 | 6/17/2022 | USD | 2,638.72 | $2,638.72 |
| 4 | 6/17/2022 | USD | 2,655.06 | $2,655.06 |
| 5 | 6/17/2022 | USD | 2,678.56 | $2,678.56 |
| 6 | 6/17/2022 | USD | 2,705.98 | $2,705.98 |
| 7 | 6/17/2022 | USD | 2,739.78 | $2,739.78 |
| 8 | 6/17/2022 | USD | 2,746.83 | $2,746.83 |
| 9 | 6/17/2022 | USD | 2,781.15 | $2,781.15 |
| 10 | 6/17/2022 | USD | 2,788.30 | $2,788.30 |
| 11 | 6/17/2022 | USD | 2,809.61 | $2,809.61 |
| 12 | 6/17/2022 | USD | 2,852.03 | $2,852.03 |
| 13 | 6/17/2022 | USD | 2,886.25 | $2,886.25 |
| 14 | 6/17/2022 | USD | 2,895.09 | $2,895.09 |
| 15 | 6/17/2022 | USD | 2,917.22 | $2,917.22 |
| 16 | 6/17/2022 | USD | 2,959.81 | $2,959.81 |
| 17 | 6/17/2022 | USD | 3,004.49 | $3,004.49 |
| 18 | 6/17/2022 | USD | 100,000.00 | $100,000.00 |
| 19 | 6/17/2022 | USD | 250,000.00 | $250,000.00 |
| 20 | 6/22/2022 | BTC | 0.05 | $979.71 |
| 21 | 6/22/2022 | BTC | 0.05 | $1,022.42 |
| 22 | 6/22/2022 | BTC | 0.05 | $1,056.93 |
| 23 | 6/22/2022 | BTC | 0.05 | $1,064.45 |
| 24 | 6/22/2022 | BTC | 0.05 | $1,075.89 |
| 25 | 6/22/2022 | BTC | 0.05 | $1,083.80 |

[7] For reference, Plaintiffs have provided the market value of the various assets as of the date of the Preferential Transfers. In doing so, Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the recovery valuation date for the Preferential Transfers or the form of recovery on any judgments.

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date[7] |
|---|---|---|---|---|
| 26 | 6/22/2022 | BTC | 0.05 | $1,088.25 |
| 27 | 6/22/2022 | BTC | 0.05 | $1,095.98 |
| 28 | 6/22/2022 | BTC | 0.06 | $1,102.99 |
| 29 | 6/22/2022 | BTC | 0.06 | $1,103.78 |
| 30 | 6/22/2022 | BTC | 0.06 | $1,107.76 |
| 31 | 6/22/2022 | BTC | 0.06 | $1,123.84 |
| 32 | 6/22/2022 | BTC | 0.06 | $1,127.90 |
| 33 | 6/22/2022 | BTC | 0.06 | $1,135.66 |
| 34 | 6/22/2022 | BTC | 0.06 | $1,143.74 |
| 35 | 6/22/2022 | BTC | 0.06 | $1,150.39 |
| 36 | 6/22/2022 | BTC | 0.06 | $1,151.64 |
| 37 | 6/22/2022 | BTC | 15.00 | $299,389.65 |

Preferential Transfers from Genesis Capital to **INX Limited** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date |
|---|---|---|---|---|
| 1 | 6/17/2022 | USD | 3,047.94 | $3,047.94 |
| 2 | 6/17/2022 | USD | 5,537.38 | $5,537.38 |
| 3 | 6/17/2022 | USD | 500,000.00 | $500,000.00 |
| 4 | 6/17/2022 | USD | 500,000.00 | $500,000.00 |

# EXHIBIT L

Tax Dividend Payments from Genesis Capital to **Digital Currency Group, Inc.** during the Preference Period

| # | Date of Transfer | Currency | Quantity | Value as of Transfer Date |
|---|---|---|---|---|
| 1 | 4/18/22 | USD | 23,902,602 | $23,902,602 |
| 2 | 6/15/22 | USD | 10,000,000 | $10,000,000 |
| 3 | 6/15/22 | USD | 384,298 | $384,298 |